1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
     EASTERN DIVISION

3

4    ERICA WILLIS STEELE,            )         ORIGINAL

5              Plaintiff,            )

6       -vs-                         )    No. 07C-6440

7    APL LOGISTICS,                  )

8              Defendant.            )

9

10        The videotaped deposition of **_ERICA STEELE_**,

11   Plaintiff herein, called for examination pursuant to

12   notice and the Federal Rules of Civil Procedure as

13   they pertain to the taking of depositions before

14   Cheryl L. Zeone, CSR, RPR, on Thursday, May 1, 2008,

15   at 1415 Black Road, Joliet, Illinois, commencing at

16   the hour of 9:55 a.m.

17

18

19

20

21

22

23

24

1                          APPEARANCES:

2


3         MARK A. LICHTENWALTER, ESQUIRE
          TRICIA M. PELLEGRINI, ESQUIRE
4             Spesia, Ayers & Ardaugh
                 1415 Black Road
5              Joliet, Illinois 60435
          E-mail: Mlichtenwalter@spesia-ayers.com
6            Tpellegrini@spesia-ayers.com
              Telephone: (815) 726-4311
7             on behalf of the Plaintiff;

8


9         ANDREW J. MARTONE, ESQUIRE
            MINDY L. MAHN, ESQUIRE
10    Bobroff, Hesse, Lindmark & Martone, PC
11        1650 Des Peres Road, Suite 200
             St. Louis, Missouri 63131
12        E-mail: Andymartone@bobroffhesse.com
             Mindymahn@bobroffhesse.com
13           Telephone: (314) 862-0608
              on behalf of the Defendant.

14


15                      ALSO PRESENT:

16
                         Tom Cherry
17           Tim Coverstone, Videographer

18

19

20

21

22

23

24

3
ERICA STEELE
May 1, 2008

1                          <u>INDEX</u>

2    WITNESS                                           PAGE
       **_ERICA STEELE_**
3        Direct Examination by Mr. Martone........   5
         Cross-Examination by Mr. Lichtenwalter....  175
4        Redirect Examination by Mr. Martone.......  205
         Recross-Examination by Mr. Lichtenwalter..  212
5

6

7    EXHIBITS                                    IDENTIFIED

8    DEPOSITION EXHIBIT NUMBER 1....................   23
         Handwritten Notes Beginning 6-6-06
9
10   DEPOSITION EXHIBIT NUMBER 2....................   28
         Complaint
11   DEPOSITION EXHIBIT NUMBER 3....................   75
         Progressive Discipline 5-15-06
12
13   DEPOSITION EXHIBIT NUMBER 4....................   75
         Progressive Discipline 5-19-06

14   DEPOSITION EXHIBIT NUMBER 5....................   75
         Progressive Discipline 5-12-06
15
16   DEPOSITION EXHIBIT NUMBER 6.................... 126
         Sexual Harassment Policy
17   DEPOSITION EXHIBIT NUMBER 7.................... 126
         Typewritten Notes 5-22-06
18
19   DEPOSITION EXHIBIT NUMBER 8.................... 128
         Typewritten Notes 5-19-06
20   DEPOSITION EXHIBIT NUMBER 9.................... 177
         Letter of Laura Khan
21

22

23

24

1      A.   Yes.

2      Q.   Okay.  Now, Mrs. Steele, why did you sue

3   APL?

4      A.   Because I was sexual harassed -- sexually

5   harassed by a supervisor that worked there, and I

6   reported it to Human Resources, and I had -- I had

7   to quit my job because they failed to do anything

8   about it.

9      Q.   Let me take that one step at a time.

10  First, it's your testimony that you were sexually

11  harassed by a supervisor while you worked at APL?

12     A.   Yes.

13     Q.   Okay.  What was that supervisor's name?

14     A.   Stephen McElrath.

15     Q.   Okay.  Was he your direct supervisor?

16     A.   Yes.

17     Q.   Other than Mr. McElrath, were you sexually

18  harassed by anyone else at APL?

19     A.   No.

20     Q.   When was the first time you believe you

21  were sexually harassed by Stephen McElrath?

22     A.   It started in December of 2005.

23     Q.   Okay.  Now, do you remember when in

24  December of 2005?

1      A.   I can't remember the exact date.

2      Q.   Okay.  Were you an employee of APL at that

3 time?

4      A.   Yes.

5      Q.   Okay.  How long had you been an employee

6 of APL in December of 2005?

7      A.   I got hired in January of 2005.  So almost

8 a year.

9      Q.   Okay.  Was Mr. McElrath your supervisor

10 when you were hired?

11      A.   Yes.

12      Q.   So he was your supervisor in January of

13 2005?

14      A.   Yes.

15      Q.   And he was your supervisor throughout the

16 year of 2005, correct?

17      A.   Yeah.  Correct.

18      Q.   And it's your testimony that you were

19 sexually harassed by Stephen McElrath for the first

20 time in December of 2005?

21      A.   Yes.

22      Q.   Please tell me what happened.

23      A.   He would come into the office and tell me

24 how good I looked.  He would use a term you have

1  nice groceries back there, which means that I had a

2  nice butt.  He even went to -- to the extent of

3  telling me that he thought that I probably had a

4  nice private part, and those were -- was his exact

5  words.  He would always try to put my arms around

6  him and grab and hug me.  He would call me little

7  pet names like, Hey, Gorgeous.

8      Q.   Okay.  Anything else in December of 2005?

9      A.   That was basically it.

10     Q.   So it's your testimony that in December of

11 2005 Stephen McElrath would tell you that you were

12 good looking?

13     A.   Yes.

14     Q.   Okay.  How many times did he tell you you

15 were good looking in December of 2005?

16     A.   Almost every day.  Every day I came to

17 work it was, Hey, Gorgeous, you look good today,

18 and, you know, Let's go out together and, Let's,

19 you know, do something, and you would -- I would

20 leave my wife for you.

21     Q.   When Mr. McElrath would tell you that you

22 were good looking or call you good looking, how

23 would you respond?

24     A.   I would respond with thank you.  Thank

1   Gorgeous.

2       Q.    You would call Mr. McElrath Sugar Foot,

3   wouldn't you?

4       A.    Yes.

5       Q.    Sugar Foot wasn't his name, was it?

6       A.    No.

7       Q.    How did you come to call Mr. McElrath

8   Sugar Foot?

9       A.    Because he reminded me of a horse and

10  that's the name that I got from a cartoon, Sugar

11  Foot.

12      Q.    So because Mr. McElrath reminded you of a

13  cartoon horse, you would call him Sugar Foot?

14      A.    Yes.

15      Q.    Okay.  When did you start --

16          MR. MARTONE:  I'm sorry.  Let's go off the

17  record for a second.

18          THE VIDEOGRAPHER:  This is the

19  videographer.  We're now going off the record at

20  10:03 a.m.

21              *(Pause in proceedings.)*

22          THE VIDEOGRAPHER:  This is the

23  videographer.  We're now going back on the record

24  at 10:03 a.m.

1   BY MR. MARTONE:

2       Q.   When did you start referring to

3   Mr. McElrath as Sugar Foot?

4       A.   I started calling him Sugar Foot probably

5   about a couple months after I got hired on from

6   APL, and I got hired on in APL 2005.  So maybe I

7   want to -- I can't remember the exact month, but it

8   probably was in probably June or July.

9       Q.   Did you ever stop referring to

10  Mr. McElrath as Sugar Foot?

11      A.   No.

12      Q.   So you referred to him as Sugar Foot

13  during the entire time you were employed at APL?

14      A.   Yes.

15      Q.   Did he ever tell you that the name

16  offended him or to stop using it?

17      A.   No.

18      Q.   Do you think that he liked the fact that

19  you were referring to him as Sugar Foot?

20      A.   Yes.

21      Q.   Were there nicknames used for any of the

22  other employees at APL while you were working

23  there?

24      A.   No.

1    you know, I don't like it, can you please tell him

2    to stop.

3        Q.    Okay.  How did she respond?

4        A.    She couldn't believe it because she

5    thought that he was a great supervisor.

6        Q.    Okay.  How many times did Mr. McElrath try

7    and make you hug him?

8        A.    I want to say about three or four times.

9        Q.    When was the first time that Mr. McElrath

10   tried to make you hug him?

11       A.    December 2005.

12       Q.    When was the last time Mr. McElrath tried

13   to make you hug him?

14       A.    I want to say April.

15       Q.    Of 2006?

16       A.    Exactly.

17       Q.    Was there a time between January of 2000

18   -- December of 2005, excuse me, and April of 2006

19   when Mr. McElrath tried to make you hug him?

20       A.    I'm sorry.  Can you rephrase the question?

21       Q.    Certainly.

22             You've testified Mr. McElrath tried to

23   make you hug him two or three times, correct?

24       A.    Uh-huh.  Yes.

19
ERICA STEELE
May 1, 2008

1      Q.   When did you become a permanent employee

2  of APL?

3      A.   January of 2005.

4      Q.   So is -- is it your testimony that

5  Mr. McElrath began sexually harassing you in

6  January of 2005?

7      A.   No.  He started harassing me in

8  December 2005.

9      Q.   So 11 months after you were hired at APL?

10     A.   Yes.

11     Q.   And for the 11 months prior to that,

12  Mr. McElrath did not sexually harass you?

13     A.   Yes.

14     Q.   He did not sexually harass you; is that

15  correct?

16     A.   He did not sexually harass me.

17     Q.   That's -- that's a bad question.  Let me

18  try one that again.

19          MR. LICHTENWALTER:  She's confused by the

20  question, Counsel.

21  BY MR. MARTONE:

22     Q.   You worked at APL from January of 2005

23  through November of 2005, correct?

24     A.   Correct.

1      Q.    Stephen McElrath was your supervisor

2   during that period of time, correct?

3      A.    Yes.

4      Q.    During that period of time, did

5   Mr. McElrath sexually harass you?

6      A.    No.

7      Q.    I believe it was also your testimony that

8   in December of 2005 Mr. McElrath said something to

9   the effect that you have nice groceries back there?

10     A.    Yes.

11     Q.    Okay.  When did he say that?

12     A.    He started saying that in December of

13  2005.  I can't remember exact date.

14     Q.    Okay.  How often did he say that?

15     A.    Almost every day.

16     Q.    So every day Mr. McElrath would say you

17  have nice groceries back there?

18     A.    Yes.

19     Q.    Okay.  How did you respond when

20  Mr. McElrath would say that?

21     A.    It made me sick.

22     Q.    Did you say anything to him about it?

23     A.    Yes.

24     Q.    What did you say to him?

1    that I left APL, he always had an offensive remark

2    towards me.

3        Q.   I believe that it was also your testimony

4    that in December of 2005 Mr. McElrath referred to

5    your private parts?

6        A.   Yes.

7        Q.   Okay.  Did that occur in front of

8    witnesses?

9        A.   No.

10        Q.   Okay.  Where did that occur?

11        A.   In our office.  Me and Stephen McElrath

12    shared an office in the back.

13        Q.   Okay.  Was Celeste anywhere near when that

14    occurred?

15        A.   No.

16        Q.   How often did Mr. McElrath refer to your

17    private parts?

18        A.   I can remember only that one time.  We

19    were sitting in the office and he said, Erica, I

20    bet you have a nice-sized private part, and he used

21    a term monkey.  Monkey.  Those were his exact

22    words.

23        Q.   How did you respond?

24        A.   I looked at him.  If I had something in my

1    hand, I would have threw it and knocked his head

2    off, but I'm not a violent person, so --

3        Q.    Other than the conduct that you attribute

4    to Mr. McElrath, have you told me about every way

5    that you were sexually harassed while you worked at

6    APL?  Well, strike that.  That's not a good

7    question.  Let me try that one again.

8            Have you told me about every way that you

9    were sexually harassed while you were working at

10   APL?

11       A.    I believe I have.

12       Q.    Was there a time or occasion that you

13   would keep a journal or a diary or a written

14   account of events that occurred while you were

15   employed at APL?

16       A.    No.

17           MR. MARTONE:  I'm going to ask that this

18   be marked as Deposition Exhibit 1, and I'll send a

19   copy down to your counsel.

20           (Marked Deposition Exhibit Number 1.)

21   BY MR. MARTONE:

22       Q.    Ma'am, have you seen the two-page document

23   which has been marked as Deposition Exhibit 1

24   before?

1   close.  I did her account when she took days off.

2   She trained me to do her account.  You know, I

3   worked for her when she was off.  We had like a

4   real close friendship.

5       Q.   Did Stephen McElrath sexually harass you

6   at any time in June of 2006?

7       A.   No.

8       Q.   So the sexual harassment ended in May of

9   2006?

10      A.   The sexual harassment ended in May, but he

11  still had -- like I said, he still was saying like

12  his little remarks.  Like he would say, I'm going

13  to come over to your house and help you plant

14  flowers.  Just things to get on my nerves to make

15  me want to -- you know, he even said it.  He even

16  told the guys, I'm going to make her quit.  I'm

17  going to make her so uncomfortable that she's going

18  to quit, and that's exactly what he did.

19      Q.   And so let me kind of back up a step.  You

20  testified that Stephen McElrath sexually harassed

21  you in April of 2006, correct?

22      A.   Correct.

23      Q.   Did Stephen McElrath sexually harass you

24  in May of 2006?

1    A.   No.

2    Q.   So the sexual harassment ended in April of

3  2006?

4    A.   Yes.

5    Q.   And then it's your testimony that Stephen

6  McElrath started doing things to annoy you to make

7  you quit, correct?

8    A.   Correct.

9    Q.   When did Stephen McElrath start doing

10 things to annoy you to make you quit?

11   A.   This happened in May.

12   Q.   So Mr. McElrath started trying to annoy

13 you in May of 2006?

14   A.   Yes.

15   Q.   In your opinion, do you have a good

16 memory?

17   A.   Do I have a good memory?

18   Q.   Do you have a good memory?

19   A.   I don't.  I really don't have a good

20 memory.

21   Q.   What did Stephen McElrath do to annoy you

22 to make you quit in May of 2006?

23   A.   What did he do?

24   Q.   Yes.

1      A.   He was just an annoying person, period.  I

2   mean, he wasn't -- he was one of the main reasons

3   that I quit, but, I mean, I felt like -- I felt

4   like, you know, no one was listening to me, you

5   know, so I had to, you know, do something.

6          I felt he had went in to all the other

7   guys.  Steve has a -- he has this way where if he

8   feel like he's getting in trouble, he's going to

9   bring everybody down with him.  So he was telling

10  all the other guys around the warehouse that I had

11  their names involved in a sexual harassment suit,

12  and he -- that's what he did.  He was annoying like

13  that.

14         He -- he felt like if he was going down,

15  everybody in the warehouse was going to go down

16  with him, and so I felt -- actually, I -- I was

17  afraid to work there because after he told that to

18  all the other guys, everybody started giving me

19  dirty looks and, you know, I felt like it was time

20  for me to go.

21     Q.   Okay.  It sounds like -- and, again,

22  ma'am, I don't want to put words in your mouth.  It

23  sounds like you believe that Mr. McElrath had kind

24  of an annoying personality.  Is that accurate?

1     A.   He had an annoying personality, yes.

2     Q.   And that if he thought he was getting in

3   trouble, I believe it was your testimony he would

4   do things to bring, quote, everybody else down with

5   him, correct?

6     A.   That's correct.

7     Q.   When was the first time you noticed that

8   personality trait in Mr. McElrath?

9     A.   I would say the first time I noticed it is

10   when I reported the sexual harassment.  Like when

11   he -- when I told Mary Werner about the sexual

12   harassment and when he found out about it, he

13   started telling all the other guys, you know.

14     Q.   Okay.

15     A.   Your name is involved with the -- you

16   know, let's, you know, try to get her out of here

17   or whatever, and it, it -- I mean, guys done came

18   back and told me, you know.  Guys like that I see

19   out on the street today, they tell me that, you

20   know, that's what he did.

21     Q.   Okay.  So -- I'm sorry.  Go ahead.  Please

22   finish.

23     A.   No, you go.  I wasn't going to say

24   anything else.

1    the only one being told what to do.  Everybody else

2    got asked.

3        Q.    Okay.  So Jerry Vance started treating you

4    disrespectfully when you were hired as a permanent

5    employee of APL?

6        A.    Yes.

7        Q.    And that was in January of 2005, correct?

8        A.    Correct.

9        Q.    And you believe that Jerry Vance singled

10   you out from the day you started working, correct?

11       A.    Oh, I know he did.  I mean, that's how I

12   felt.  I mean, he was -- like I said, he was always

13   yelling at me and telling me, and then this was in

14   front of other employees.  And they, sometimes both

15   of them, would come back there and give me like a

16   -- a tag team.

17            I mean, I had to train other women, you

18   know, that worked back there, and I had to do it

19   like they had to be done.  I mean, it's like I got

20   like the short end of the stick when I worked

21   there.  And I think that's the only reason why

22   Steve did get away with it because he seen how they

23   treat me, so he thought that he could do the same

24   thing, but he went too far.

1    and the third reason is that you believe you were

2    treated unfairly by Jerry Vance and Mary Werner.

3            Do I have those reasons correct so far?

4        A.    No.  I mean, I quit because I was being

5    sexually harassed.  That should have been the first

6    reason.  I was being sexually harassed by a

7    supervisor.

8        Q.    Stephen McElrath?

9        A.    That's correct.

10        Q.    When did you quit?

11        A.    I left June 9, 2006.

12        Q.    At that point in time, Stephen McElrath

13    wasn't sexually harassing you, was he?

14        A.    No.

15        Q.    So that wasn't a reason you quit, was it?

16        A.    Well, that wasn't the reason I quit, but I

17    was still stuck in the same office with him, and he

18    was still talking to me like we was best friends.

19    So, you know, nobody stood up for me at APL.

20    Nobody.

21            Mary Werner, I trusted her and thought

22    that she would understand.  She didn't do anything

23    about it.  I went to Jerry Vance.  He didn't do

24    anything about it.  So I was just stuck walking

1    minutes?  That was another reason.  They lied on me

2    and said I falsified company documents.

3         Q.   Okay.  And so another reason you quit was

4    because you believe you were falsely accused of

5    falsifying company documents?

6         A.   Yes.  And that goes on your record.  I

7    mean, when you go for other employment, doesn't

8    that go on your record?

9         Q.   So I'm -- just what I want to do is see if

10   I can keep track of the reasons that you quit.

11        A.   Okay.

12        Q.   Okay.  So when I go through them, I'm not

13   going through them in order of priority.

14        A.   Okay.

15        Q.   In other words, I'm not putting the most

16   important first.  Okay?

17        A.   Okay.

18        Q.   I'm doing it in the order you've told us

19   about them.

20        A.   Okay.

21        Q.   So the first reason you quit was because

22   you were getting the cold shoulder from your

23   coworkers, correct?

24        A.   Correct.

1       Q.   The second reason you quit was because you

2   were not separated from Stephen McElrath, correct?

3       A.   Correct.

4       Q.   The third reason you quit was because you

5   were being treated unfairly by Jerry Vance and Mary

6   Werner, correct?

7       A.   Correct.

8       Q.   The fourth reason you quit was because you

9   had been previously sexually harassed by Stephen

10  McElrath?

11      A.   Correct.

12      Q.   The fifth reason you quit was because you

13  believe you were falsely accused of falsifying

14  company documents, correct?

15      A.   Yes.

16      Q.   Were there any other reasons why you quit?

17      A.   That's all I can remember right -- for

18  right now.  I mean --

19      Q.   Let -- let me ask you, ma'am:  Did you

20  ever keep a journal or notes or anything about

21  things that happened while you were at APL?

22      A.   I didn't feel like it was necessary.  I

23  thought that they was going to take care of this

24  situation as soon as I told them because that's

1     A.   Yes.

2     Q.   Okay.  And just looking at the first page,

3 can you tell me what Deposition Exhibit 5 is?

4     A.   This is a written warning.

5     Q.   Okay.  Who was this written warning given

6 to?

7     A.   It was given to me.

8     Q.   Okay.  Why were you given this written

9 warning?

10    A.   Because Steve said that I was not

11 following proper work procedures as it is stated on

12 there.

13    Q.   Okay.  And this bears some documents that

14 are attached to this, correct?

15    A.   That's correct.

16    Q.   And the documents deal with basically work

17 that you had performed, correct?

18    A.   That's correct.

19    Q.   Do you believe that you deserved to

20 receive this written warning, Deposition Exhibit 5?

21    A.   No.

22    Q.   Do you believe it was unfair?

23    A.   Yes.

24    Q.   Why?

1    A.   Because this -- it wasn't my fault that

2  the work was printed out wrong.  They told me when

3  I started there that the inventory was messed up

4  and that the paperwork would print out the amount

5  of the quantity.  And there's always 48 pallets to

6  a case, so if the number came out incorrect, I was

7  supposed to change that number that wasn't correct

8  and put the correct number on there.  And Will

9  Gavin, also.  We both were told to do it like that.

10    Q.   And so it's your testimony that this

11  warning was unfair because the mistakes weren't

12  your fault?

13    A.   That's correct.

14    Q.   Okay.  And you received this warning on

15  the 15th of May, 2006, correct?

16    A.   That's correct.

17    Q.   Let's go to the document which has been

18  marked as Deposition Exhibit 3 now.

19       Do you have that document in front of you?

20    A.   Yes.

21    Q.   And is this document, the document which

22  has been marked as Deposition Exhibit 3 -- well,

23  let me ask you:  What is it?

24    A.   It's a written warning with a three-day

1    suspension.

2        Q.   And is this -- who was that written

3    warning and suspension given to?

4        A.   It was given to me from Stephen McElrath.

5        Q.   Okay.  Why were you given this written

6    warning and three-day suspension?

7        A.   Because Steve said that I falsified

8    company document -- documents.

9        Q.   Okay.  And is -- is that the time record

10   we were talking about?

11       A.   Yes.

12       Q.   And you were given this suspension and

13   written warning on May 15, 2006, correct?

14       A.   Correct.

15       Q.   Do you believe that you deserved this

16   written warning and suspension?

17       A.   No.

18       Q.   Okay.  Please explain why not.

19       A.   Because, like I said, they said -- well,

20   Steve said I falsified company documents, and I --

21   I wrote the time on there that I arrived to work.

22   And how did he know what time I came to work?  He

23   wasn't even -- you know, he wasn't even in the

24   office when I came to work.  And why would I lie

1    Q.   It was somewhat unusual to have a meeting

2    scheduled like that for the employees, wasn't it?

3    A.   Yes.

4    Q.   And do you remember if there were company

5    officials who were in to talk to the employees on

6    that day?

7    A.   Yes.  I do remember there were company

8    officials.

9    Q.   Do you remember any of the names?

10   A.   No.

11   Q.   Okay.  If I use the name Kyle Oslos, would

12   you remember that?

13   A.   I just heard about that name yesterday.

14   Q.   Okay.  And so you knew on the 15th that

15   all the employees were supposed to go to a meeting,

16   correct?

17   A.   Well, I didn't know until somebody came

18   back there and told me.  I had came in through the

19   back door and started my work.

20   Q.   But you were late for work that day,

21   weren't you?

22   A.   I was late.

23   Q.   And when you got to work that day, it's

24   your testimony you were only five minutes late?

1    harassment by Stephen McElrath in January of 2006,

2    correct?

3        A.    Correct.

4        Q.    That was the first time you complained to

5    Mary Werner?

6        A.    That was the first time.

7        Q.    Then you didn't feel you were being

8    treated fairly and you weren't moved.  You

9    continued to have to work with Stephen McElrath, so

10   you filed a Charge of Discrimination, correct?

11       A.    Yes.

12       Q.    And then after that, you complained a

13   second time to Mary Werner and you gave Mary a copy

14   of the charge, right?

15       A.    Yes.

16       Q.    Okay.  In fact, didn't you file a Charge

17   of Discrimination because you were given written

18   warnings on May 15th and May 12th of 2006?

19       A.    I filed -- yes.  But, like I said, I felt

20   like that they knew -- she -- Mary Werner knew

21   about the sexual harassment.  Jerry Vance knew

22   about the sexual harassment.

23            Why all of a sudden would they wait to

24   write -- I had never been wrote up at that job, and

1      Q.    Okay.  Do you remember when you got the

2  raise?

3      A.    I don't remember the exact date, but it

4  had to be -- I worked there for almost 18 months,

5  so it probably had to be after a year.

6      Q.    So 12 months.  So you started working at

7  APL in January of 2005, correct?

8      A.    That's correct.

9      Q.    And you probably got your raise sometime

10  after January of 2006, correct?

11      A.    I can't even remember the exact dates, but

12  I'm thinking it was before January of 2006.

13      Q.    Were you ever up for any promotions while

14  you worked at APL?

15      A.    No.

16      Q.    Were there any promotions available?

17      A.    Not that I know about.

18      Q.    Who decided at APL whether or not you

19  would get raises?

20      A.    I think that probably would be Jerry

21  Vance.

22      Q.    During the time you worked at APL, did

23  Stephen McElrath ever request sexual favors from

24  you?

1       A.   Yes.

2       Q.   Okay.  When?

3       A.   December.  He'd always say, Let's go to

4    the hotel and let me take you out.  I'll leave my

5    wife for you.  He would always -- even when I asked

6    for like -- you know, I worked on other accounts

7    and I told him that when am I going to get a raise?

8    He was, I'll give you a raise, all right.  You know

9    what you have to do.  There was many times he said

10   things like that to me.

11      Q.   You knew that Stephen McElrath didn't

12   decide whether or not you got raises, didn't you?

13      A.   I knew that.

14      Q.   And you also knew that Stephen McElrath

15   didn't decide whether or not you got promoted,

16   correct?

17      A.   He -- he probably had something to do with

18   it because he did work with me.  So he could have

19   put in a good word and said, you know, she's doing

20   a great job or -- and that's the thing about it.

21   They always told me how good of a job I was doing

22   until after the sexual harassment -- after I told

23   Mary about the sexual harassment, and it's like

24   everything stopped.

1      Q.   Well, who told you you were doing a good

2   job?

3      A.   Jerry sometimes would -- if he's in a good

4   mood, he would say, okay, keep up the good work,

5   but that was just his character.  I think it's just

6   being like that.  He was mean, but if you did a

7   good job, he would acknowledge that.

8      Q.   Okay.  Who else?

9      A.   And then Steve would say it sometime.

10      Q.   So Stephen McElrath would tell you you

11   were doing a good job?

12      A.   Yes.

13      Q.   Other than Jerry Vance occasionally

14   telling you you were doing a good job and Stephen

15   McElrath telling you were doing a good job, did

16   anyone at APL tell you you were doing a good job?

17      A.   Well, I worked on, like I said, on

18   different accounts.  I worked on Celeste's

19   accounts, too.  They was always happy about telling

20   me how good and fast I learned that job so -- both

21   Steve and Jerry.

22      Q.   Other than Steve and Jerry, did anyone at

23   APL ever tell you you were doing a good job?

24      A.   Other employees.

1    Q.   Like whom?

2    A.   There were a couple women that were

3    forklift drivers.  They worked -- one was named

4    Michelle Lewis.  She worked on the Kawasaki

5    account.  I mean, she was impressed about how good

6    I did the Kawasaki account because it's a hard

7    account to do.  So she was always, you know,

8    pleased with how I did that account.

9    Q.   While you were working at APL, were you

10   ever denied a raise that you thought you should

11   have gotten?

12   A.   No.  I -- like I said, I was just happy to

13   be making $13 an hour.

14   Q.   While you were working at APL, were you

15   ever denied a promotion that you thought you should

16   have gotten?

17   A.   No.

18   Q.   If you were separated from Stephen

19   McElrath while you were working at APL, what would

20   you have done?  What job would you have done?

21   A.   I would have took anything that they would

22   have gave me as long as it would have been my

23   regular pay, $13.15 an hour.  I would have

24   picked -- they had pickers there that picked.  I

1   Attention Lisa on it.

2       A.   Oh, this was for my unemployment.  They

3   said that I had -- I would have to fax all the

4   documents to see if I could get my unemployment,

5   and she told me to write Attention Lisa at the top.

6       Q.   Okay.  The first sentence reads, On

7   May 19, 2006, at approximately 9:15 a.m., Stephen

8   McElrath and I got into a verbal altercation.

9           Is that accurate?

10      A.   Uh-huh.

11      Q.   You have to say yes or no.

12      A.   Oh, I'm sorry.  Yes.

13      Q.   Okay.  Tell me what happened in that

14  altercation.

15      A.   Well, like it says in the letter, I asked

16  him why is he telling people that -- about my

17  suspension.  And he said he's not saying anything,

18  but I got all these coworkers coming up to me

19  telling me that he said that I falsified my time

20  sheet.  And -- and I said, Steve, could you stop

21  telling -- you know, telling people that I

22  falsified.  I don't have to steal five minutes from

23  APL.  And so he got mad and said, you know, let --

24  what it says in the letter.

ERICA STEELE
May 1, 2008

1      Q.    Okay.  You missed most of the meeting,
2   didn't you?
3      A.    That's correct.
4      Q.    And Bill Banks got mad at you because you
5   came in late and missed most of the meeting, didn't
6   he?
7      A.    That's correct.
8      Q.    And he publicly yelled at you for missing
9   that meeting, correct?
10      A.    That's correct.
11      Q.    And shortly after that, you were suspended
12   for falsifying company time records, correct?
13      A.    That's correct.
14      Q.    And then after Bill Banks yelled at you
15   publicly and you were suspended, you missed
16   three days of work, correct?
17      A.    No.  I was suspended.
18      Q.    Okay.  And then when you were suspended,
19   you were not at work for three days, correct?
20      A.    Correct.
21      Q.    And then you returned to work on the 19th
22   of May, correct?
23      A.    That's correct.
24      Q.    Do you believe that the other employees

1       A.   Yeah.

2       Q.   So if we turn to the next page of

3   Deposition Exhibit 3, is this the time sheet you

4   filled out?

5       A.   Uh-huh.  Yes.

6       Q.   Okay.  When you were in the verbal

7   altercation with Mr. McElrath on May 19, 2006, did

8   you discuss any subject other than your belief that

9   he was telling other staff members about the

10  suspension?

11      A.   No.

12      Q.   Mr. McElrath denied telling other

13  employees about the suspension, didn't he?

14      A.   Yes, he did.

15      Q.   And then you responded, I think we need to

16  go talk to Mary Werner concerning this matter,

17  correct?

18      A.   Correct.

19      Q.   And then his response was for you to go

20  home?

21      A.   Yeah.  Yes.

22      Q.   Can you tell me who said what?  I mean,

23  how did that go?

24      A.   Well, I came back from work after my

1    three-day suspension to the office, and I said,

2    Steve -- even Celeste came and told me, What

3    happened?  Steve, he is -- she the one who told me

4    Steve is going around telling everybody you got

5    suspended because you lied and you stole some money

6    from -- you're trying to steal money from the

7    company.

8         So I was like, man.  So I go in the office

9    and I said, Steve, can you please stop telling all

10   the workers that I got suspended.  I ain't told

11   nobody nothing.  I ain't told nobody nothing.  I

12   like, Steve, they said -- it's people coming up to

13   me telling -- telling me that you say that I'm

14   stealing money from the company and I'm lying on my

15   time sheet.  Why are you doing that?

16        And then I say, you know what, I'm just

17   going to go talk to Mary about what's going on.  He

18   said, You ain't going to do nothing.  You know

19   what, punch out and go home.  And that's when I

20   picked up the phone, and I said, Mary, he told me

21   to punch out and go home.  And she still didn't do

22   nothing.  So I left and went home.

23   Q.   Did you call Mr. McElrath a liar in that

24   altercation?

1     A.  I did not call him a liar.

2     Q.  If you had called him a liar, would you

3 agree that that would be insubordination?

4     A.  Yes.

5     Q.  When you spoke with Mary Werner on

6 May 19th of 2006, did she tell you that it was

7 General Manager Bill Banks who gave you the

8 three-day suspension?

9     A.  Yes, she did.

10     Q.  And she told you that was because Bill

11 Banks was upset that you were late coming to the

12 meeting, didn't she?

13     A.  Yes, she did.

14     Q.  And you knew that Bill Banks was upset

15 that you were late coming to the meeting?

16     A.  Yes, I did.

17     Q.  Then you told Mary that you were tired of

18 Steve, Bill, and Jerry always talking down to you?

19     A.  I did say that.

20     Q.  Have you told us today about every way

21 that Stephen McElrath would talk down to you?

22     A.  Just as far as the sexual harassments and

23 -- and then, you know, he would talk to me like I

24 was his wife.  Like, for instance, like punch out

1    out and go home, you met face-to-face with Mary

2    Werner, didn't you?

3        A.   Yes.

4        Q.   And in that meeting, you gave Mary Werner

5    a copy of your Charge of Discrimination with the

6    Illinois Department of Human Rights, correct?

7        A.   On May 19th, yeah.  Because I filed it on

8    May 18th.  Yes.

9        Q.   Okay.  And so after Stephen McElrath told

10   you to punch out and go home and after he wrote you

11   up for insubordination, you gave Mary Werner a copy

12   of your discrimination claim, right?

13       A.   I think I gave her a copy before -- I

14   can't remember the exact time when I gave it to

15   her.  I don't know if it was after or before the --

16   that I gave her the discrimination.

17       Q.   Okay.  Well, let's walk through your

18   statement.

19       A.   Okay.

20       Q.   At the time you prepared this, was it

21   true, accurate, and complete?

22       A.   Yeah.  I did give her a copy of it.  Yeah.

23       Q.   And you gave her the copy after you were

24   written up for insubordination, didn't you?

1    A.   Yeah.  But I had already filed it.

2    Q.   But you hadn't given --

3    A.   But I didn't --

4    Q.   I'm sorry.

5    A.   -- know I was going to get written up for

6    insubordination because I had -- I had -- when I

7    came back to work for May 19th, I had had my

8    discrimination charge.

9    Q.   You had filed it?

10    A.   Right.  I had filed it.

11    Q.   With the Department of Human Rights?

12    A.   Yes.

13    Q.   So the very next day, you gave Mary Werner

14    a copy of the charge you filed, right?

15    A.   Right.

16    Q.   And you gave her that charge after your

17    alteration with Stephen McElrath after McElrath

18    told you to punch out and go home and after he

19    wrote you up for insubordination, correct?

20    A.   Correct.

21    Q.   So when Mr. McElrath told you to punch out

22    and go home and wrote you up for insubordination,

23    he couldn't have been retaliating against you for

24    filing a charge with the Department of Human

1    Rights, could he have?

2        A.    I don't understand.  Can you rephrase the

3    question?

4        Q.    I mean, you filed a Charge of

5    Discrimination with the Department of Human Rights,

6    correct?

7        A.    That's correct.

8        Q.    Mr. McElrath on May 19th told you to punch

9    out and go home and wrote you up for

10   insubordination, correct?

11       A.    That's correct.

12       Q.    But he did those things before you gave

13   the Company a copy of your charge, didn't he?

14       A.    Yeah.  But he could have easily -- I told

15   Celeste about my sexual harassment.  Celeste knew

16   that I had filed a sexual harassment.  She could

17   have easily told him because she was close to him,

18   too.

19       Q.    When --

20       A.    So they worked together a lot, too.  So he

21   could have knew about it.

22       Q.    Well, do you know for a fact that Celeste

23   told Stephen McElrath that you'd filed a complaint

24   of sexual harassment with the Department of Human

1   Rights?

2       A.   I don't know for a fact.

3       Q.   Okay.  And you didn't tell Stephen

4   McElrath you'd filed a Complaint of Discrimination

5   with the Department of Human Rights, did you?

6       A.   I did not.

7       Q.   And Celeste was your good friend, wasn't

8   she?

9       A.   Yes.

10      Q.   Have you talked to Celeste since you left

11  the employment of APL?

12      A.   No.

13      Q.   Now, you understand that one of the things

14  that you've claimed in your lawsuit is that APL

15  retaliated against you for complaining about sexual

16  harassment, correct?

17      A.   Yes.

18      Q.   How did APL retaliate against you for

19  complaining about sexual harassment?

20      A.   Well, they -- look at the write-ups that I

21  got.  I got insubordination, falsely -- falsifying

22  company documents, insubordination.

23      Q.   Okay.  Let me --

24      A.   I mean, they kept me in the office with

1    Steve.  You know, I reported the sexual harassment.
2    They were bringing temporary employees in, putting
3    them on assignments when they could have easily
4    moved me to a different assignment.  And then with
5    the lady that came from corporate, they didn't
6    even -- I thought that I should have been the first
7    person that she came to talk to since I was the
8    victim.
9        Q.    Let me go through these just to make sure
10   I've got the list.  Okay?
11       A.    Okay.
12       Q.    And I want to say before I start that I'm
13   not putting anything in the list as being more
14   important than anything else in the list.  Okay?
15       A.    Okay.
16       Q.    I'm going to give you the list in the
17   order that you gave it to me.
18       A.    Okay.
19       Q.    The first way that you believe APL
20   retaliated against you was because of the write-ups
21   you received, correct?
22       A.    That's correct.
23       Q.    And those write-ups we're talking about
24   are Deposition Exhibits 3, 4, and 5, correct?

1   you were asked a series of questions about

2   compliments to your appearance.

3           Did Mr. McElrath's comments, in your

4   opinion, go beyond mere gratuitous statements

5   regarding your appearance?

6       A.   Yes.

7       Q.   How so?

8       A.   He would tell me how nice my butt looked

9   in my jeans.  I have a birthmark on my leg that

10  could nobody see it but my husband, but I guess I

11  had on a skirt one day and he seen it.  And he told

12  all the guys in the warehouse that I got this

13  birthmark.

14          And he came back to me and told me I could

15  make your husband cheat on you -- I mean, I can

16  make your husband leave you.  All I got to do is

17  tell him you're cheating.  And I'm like, Steve, why

18  would you say something like that?  I said, you

19  can't tell my husband anything that's going to make

20  him want to leave me.  Yeah?  What about that

21  birthmark?  And I just got so mad because I'm

22  thinking like how could he have seen that if he

23  wasn't looking that hard.  And I remember having on

24  a skirt that day, and that's how he was able to see